LANCASTER COMMUNITY HOSPITAL,
Plaintiff–Appellant,

v.

ANTELOPE VALLEY HOSPITAL
DISTRICT, Defendant–Appellee.

LANCASTER COMMUNITY
HOSPITAL, Plaintiff–Counter–
Defendant–Appellant,

v.

ANTELOPE VALLEY MEDICAL
GROUP, INC.,
Defendant–Appellee,

and

Antelope Valley Hospital District,
Defendant–Counter–Claim–3rd
Party–Plaintiff–Appellee.

Nos. 89–55167, 89–55347.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 9, 1990.

Decided Jan. 18, 1991.

Withdrawn July 15, 1991.

Filed July 15, 1991.

Robert Fabrikant, McKenna, Conner & Cuneo, Washington, D.C., for plaintiff-appellant.

John S. Hoff, Swidler & Berlin, Washington, D.C., and Jack T. Holland, Hefner, Stark & Marois, Sacramento, Cal., for defendants-appellees.

Joseph E. Sheeks, Law Offices of Joseph E. Sheeks, San Rafael, Cal., for amicus.

Before HUG, HALL and TROTT, Circuit Judges.

## ORDER

The opinion filed January 18, 1991, is hereby withdrawn and the attached opinion shall be filed in its stead.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. (Fed.R.App.P. 35.)

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

Lancaster Community Hospital ("Lancaster") appeals two district court orders. In the first order, the district court granted defendants' motions for summary judgment on Lancaster's federal antitrust

claims. In the second order the district court did the same with respect to Lancaster's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

## I

Plaintiff-appellant Lancaster brought a federal antitrust action [1] against Antelope Valley Hospital ("Antelope"), Antelope Valley Hospital District ("District"),[2] and Antelope Valley Medical Group ("Group"). Lancaster alleged that the defendants sought to use Antelope's monopoly in perinatal services to increase the hospital's market share in non-perinatal services. Antelope, it is said, would not allow certain health maintenance organizations ("HMOs") to contract for perinatal services unless the HMOs agreed to use Antelope for non-perinatal services as well. The district court granted both Antelope's and the District's motions for summary judgment,[3] based on the state action immunity doctrine and the Local Government Antitrust Act of 1984, 15 U.S.C. § 35.

Lancaster then reformulated its complaint to allege RICO claims against the District and Group pursuant to 18 U.S.C. § 1962(b)–(c). The complaint accused defendants of conducting the affairs of Antelope through a pattern of fraudulent schemes, including misappropriation of public funds, violations of federal and state anti-kickback statutes, and violations of state laws prohibiting the making of false entries in the records of a corporation. Lancaster further alleged that defendants

furthered these purportedly fraudulent schemes by use of the United States mails. The district court granted defendants' motions to dismiss Lancaster's RICO claims finding, *inter alia,* that Antelope and District, as government entities, could not be held liable under RICO, and that Lancaster had failed to establish the predicate act of mail fraud.

## II

The district court had jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and *id.* § 1337 (commerce and antitrust regulations). *See also* 15 U.S.C. §§ 15, 26. Additionally, the district court had jurisdiction over the civil RICO claim pursuant to 18 U.S.C. § 1964. This court has jurisdiction under 28 U.S.C. § 1291, since the district court converted its summary judgment orders to final judgments pursuant to Fed.R.Civ.P. 54(b).

"We review a grant of summary judgment de novo. *Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986)." *United States v. CMA, Inc.,* 890 F.2d 1070, 1072 (9th Cir.1989).

## III

The first question we must decide is whether defendants Antelope and District are beyond the reach of the antitrust laws

---

**1.** The complaint also contained state-law antitrust claims as well as state tort claims. Although the court granted Antelope's motion for summary judgment on these claims, Lancaster's appeal only concerns the federal antitrust claims.

**2.** Antelope is owned and operated by the District. The District is a not-for-profit hospital district organized under California's Local Hospital District Law, Cal. Health & Safety Code § 32000. Although the district court's initial grant of summary judgment was directed in favor of Antelope, the court in a later order specified that "[i]n its previous order, the Court found that the District was clothed with immunity from plaintiff's antitrust claims under the

state action doctrine." (ER at 146) None of the parties on appeal contends that a meaningful distinction between Antelope and the District can be made for purposes of state action immunity.

**3.** The district court refused to grant the Group's motion for summary judgment, concluding that since the Group is a private entity the test announced in *Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988), would have to apply for the Group to qualify for state action immunity. The court was unprepared to state at the time of the motion whether the Group would qualify for such immunity. This ruling is not before us on appeal.

by operation of state-action immunity. This question turns on whether the California state legislature has displaced competition with regulation in the provision of hospital services.[4] We conclude that defendants are not exempt from the antitrust laws, and we accordingly reverse the district court's grant of summary judgment in favor of defendants on the antitrust claim.[5]

■ It is clear that a state itself, whether acting through its legislative, judicial, or executive departments, is not subject to the antitrust laws. *See Parker v. Brown*, 317 U.S. 341, 350–52, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943); *Charley's Taxi Radio Dispatch v. SIDA of Hawaii*, 810 F.2d 869 (9th Cir.1987). However, when a state delegates authority to a subordinate entity that then acts anticompetitively, the subordinate is not automatically beyond the reach of antitrust. *See Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) (municipality); *Grason Electric Co. v. Sacramento Municipal Utility District*, 770 F.2d 833, 836–38 (9th Cir.1985) (local electrical utility district), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986). The courts must assure themselves that the subordinate acts in accord with the state's wishes when it contravenes the federal antitrust laws. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

In *Town of Hallie* the Supreme Court addressed at length the question whether a municipality had established state action immunity. The City of Eau Claire, which had the only sewage treatment facilities in the vicinity, refused to supply sewage treatment services to adjoining towns unless they agreed to use its sewage transportation and collection services as well.

Further, the city would supply landowners in the area with sewage treatment services only if they agreed to be annexed. The Supreme Court held that the city was not subject to the antitrust laws, but fell within the state action exemption. *Town of Hallie*, 471 U.S. at 41–44, 105 S.Ct. at 1717–19.

The Court held that for the city to be exempt it had to show that it acted pursuant to a "clearly articulated" state policy to displace competition with regulation. *Id.* However, the city was not required to point to a specific, detailed legislative authorization for either its specific action or for anticompetitive conduct in general in order to show this "clearly articulated" state policy. *Id.* at 42, 105 S.Ct. at 1718. Rather, a showing that the city had general authority to provide sewer services and fix the limits of service in unincorporated areas was sufficient. Since the city's anticompetitive actions were the "foreseeable and logical result" of its power to refuse to serve unannexed areas, the city acted in accord with state policy and was immune to antitrust challenge. *Id.* at 41–42, 44, 105 S.Ct. at 1717–18, 1719; *see also Columbia v. Omni Outdoor Advertising, Inc.*, —— U.S. ——, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991).

Defendants Antelope and District argue that, under *Town of Hallie*, their broad authority to provide hospital services in and of itself establishes authority to exclude others from providing hospital services. Further, defendants contend that we may not, in deciding whether the state's policy is to support competition or supplant it, consider the general state policies towards competition in the hospital service sector of the economy. In defendants' view we can do no more than lay the lan-

**4.** We often say that this issue requires a two-step analysis: First, whether the activity complained of is authorized; second, whether the state intends to displace competition with regulation. *See, e.g., Traweek v. San Francisco*, 920 F.2d 589, 591–92 (9th Cir.1990); *Boone v. Redevelopment Agency*, 841 F.2d 886, 890 (9th Cir.), *cert. denied* 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988). In this case there is no question but that defendants were authorized to enter into contracts. We thus turn to the question whether the state has displaced competition with regulation.

**5.** Since we find that Antelope and District are not authorized to act anti-competitively, we need not go on to decide whether Lancaster's competitors have such influence over Antelope and District that active state supervision is required to validate their anticompetitive conduct under *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988).

guage of their authorization alongside the language of the authorization provided the City of Eau Claire in *Town of Hallie.* If the language of defendants' grant is as broad as Eau Claire's, we are to find that defendants are exempt from the antitrust laws.

*Town of Hallie* does not support defendants' mechanistic position. Under *Town of Hallie* the courts are to focus on whether the state's policy is to supplant or support competition in the area of dispute, albeit paying particular attention to the foreseeable or logical consequences of a state's grant to a delegate of broad authority. *Town of Hallie* does not require that we invariably conclude, regardless of the circumstances, that a broad mandate to act gives authority to prevent others from acting. The *Town of Hallie* Court itself considered extraneous Wisconsin statutes on the subject of municipal sewer systems, as well as Wisconsin state court decisions, in evaluating Wisconsin's policy towards competition. 471 U.S. at 42 n. 5, 44 n. 8, 105 S.Ct. at 1718 n. 5, 1719 n. 8.[6]

In addition to *Town of Hallie,* defendants cite to a number of Ninth Circuit cases. However, a close reading of these cases shows that none of them lend defendants compelling support.

First, a number of defendants' cases are of limited value because they simply involve the straightforward application of *Town of Hallie* in circumstances quite unlike those now presented. To recite the facts of these cases is to distinguish them from the instant case. For example, in *Mercy-Peninsula Ambulance, Inc. v.*

*County of San Mateo,* 791 F.2d 755, 757 (9th Cir.1986), the court held that the logical result of a county's power to create an Emergency Medical Service with only a few authorized ambulance services is that other ambulance services will be excluded. *See also Traweek,* 920 F.2d at 593 (it is a logical and foreseeable result of city's zoning authority that some builders are excluded);[7] *Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886, 890 (9th Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988) (redevelopment agency with power to zone, rezone, and grant exceptions from building regulations); *Llewellyn v. Crothers,* 765 F.2d 769 (9th Cir.1985) (directors of state agency authorized to set rates).

A second set of defendants' cases is of limited value because the cases cited involve utilities of one sort or another. *See Kern-Tulare Water District v. City of Bakersfield,* 828 F.2d 514, 520 (9th Cir. 1987) (water works), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988); *Grason Electric Co. v. Sacramento Municipal Utility District,* 770 F.2d 833, 836-38 (9th Cir.1985) (local electrical utility district), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986); *Preferred Communication, Inc. v. Los Angeles,* 754 F.2d 1396 (9th Cir.1985) (cable television), *aff'd on other grounds,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986). We indicated in *Preferred Communication* that because utilities place a burden on public resources—for example, they often string high voltage wires about—they are usually intensively regulated. 754 F.2d at 1414-15.[8] Since utilities are usually reg-

---

**6.** The entire thrust of *Town of Hallie* is to caution against parsing state statutes in an attempt to find a specific authorization for a particular activity, since "[n]o legislature can be expected to catalog all of the anticipated effects of a statute...." 471 U.S. at 43, 105 S.Ct. at 1718. It is in this light that the Court's caution against too close an "examination of a state legislature's intent" must be read. *Id.* at 44, 105 S.Ct. at 1719. Clearly the Court did not mean to foreclose such examination as is necessary to understand the state's delegation in light of the state's general policy.

**7.** Contrary to Antelope's contentions, *Traweek* is wholly consistent with our approach in the in-

stant case. The *Traweek* court considered the statutes that were relevant to the case before it, and concluded that the state had displaced competition with regulation. *Traweek,* 920 F.2d at 593. Although we too focus on the question of whether the state's policy is to suppress or support competition, we deal with different statutes here.

**8.** Perhaps a better explanation of why electric utilities, water works, and cable television are generally highly regulated is that these industries are paradigmatic examples of natural monopolies.

The unifying characteristic of natural monopoly industries is the ability of a single firm to

# 402

ulated, we have been more willing to find that a statute displaces competition with regulation if the statute concerns a utility. *Compare Grason Electric Co.,* 770 F.2d at 836–38 (finding anticompetitive conduct a foreseeable result of the creation of a utility) *with Medic Air Corp. v. Air Ambulance Authority,* 843 F.2d 1187, 1189 (9th Cir.1988) (the creation of a single dispatcher for a region did not indicate a policy to eliminate competition in the normally competitive air ambulance business).[9]

Finally, defendants cite a number of cases in which a general power to regulate cannot be seriously contested. These cases turn on the question whether the *misuse* of a clearly granted regulatory power causes state-action immunity to lapse.[10] Interesting as this question may be, the issue in the instant case is whether competition has been supplanted by regulation in the first place, and these cases are therefore inapposite.

■ Applying the standards set forth in *Town of Hallie* and its Ninth Circuit progeny, we conclude that the state of California has not displaced competition with regulation in the provision of hospital services, and that defendants are therefore not shielded by state-action immunity. No single factor in isolation brings us to this conclusion. Rather, we focus on two points.

First, the state has given the defendants no power to regulate the hospital services market, but has merely authorized them to provide hospital services along with regular competitors.[11] This in itself does not

provide the most economical service to a given area. Within the area reached by the physical facilities of the firm, the introduction of additional suppliers requires a wasteful duplication of plant and a significant increase in cost not normally justified by any benefits to users of the service. Under such circumstances, monopoly is accepted as the most appropriate industry structure and the industry is subjected to regulation as a "public utility."

Jones, Government Price Controls and Inflation: A Prognosis Based on the Impact of Controls in the Regulated Industries, 65 Cornell L.Rev. 303, 304 (1980). *See generally,* M. Handler, H. Blake, R. Pitofsky & H. Goldschmid, Cases and Materials on Trade Regulation App. B (2d ed. 1983).

**9.** This ground for distinguishing the instant case from these other cases in no way contradicts *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). In *Garcia* the Supreme Court repudiated the unworkable distinction between "integral" and "proprietary" government functions in the context of state sovereign immunity analysis. In the instant case we do not attempt to revive this discredited approach for use in the field of state-action immunity. Rather, we explain the different approaches that this court has taken when attempting to divine a state's view towards competition. This court, in considering whether a state has intended to displace competition with regulation, seems to have considered whether competition is generally thought to be a viable alternative to regulation in the relevant sphere of economic activity. In cases involving paradigmatic natural monopolies, we have more readily found that the legislature has intended to displace competition with regulation.

**10.** The answer is a resounding "no." *See Traweek,* 920 F.2d at 592–93 (city does not lose antitrust exemption because it exercised zoning authority maliciously); *Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886, 890 (9th Cir.), *cert. denied* 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988) (redevelopment agency with power to zone, rezone, and grant exceptions from building regulations does not lose antitrust immunity because it may have exercised its regulatory power corruptly); *Llewellyn v. Crothers,* 765 F.2d 769 (9th Cir.1985) (directors of state agency authorized to set rates do not lose state-action exemption if they act corruptly).

**11.** Local hospital districts have been granted the powers needed to engage in the hospital business by the state of California. A hospital district's board of directors

shall be responsible for the operation of all hospitals owned or leased by the district, according to the best interests of the public health and shall make and enforce all rules, regulations and bylaws necessary for the administration, government, protection and maintenance of hospitals under [its] management and all property belonging thereto and may prescribe the terms upon which patients may be admitted thereto.

Cal.Health & Safety Code § 32125. Among other powers, local hospital districts can:
• establish, maintain and operate one or more health facilities at any location for the benefit of the district and the people served by the district (§ 32121(j));
• establish rates, and do so in a way which "will permit the hospital to be operated upon a self-supporting basis" (§ 32125) (emphasis added);
• "finance experiments with new methods of providing adequate health care" (§ 32126.-5(c));

seem to indicate that the state has displaced competition with regulation in the provision of hospital services. Since defendants are not associated with a paradigmatic example of a natural monopoly, *cf. Grason Electric Co.*, 770 F.2d at 836–38 (discussed supra), a mere statutory authorization to engage in business will not be so readily viewed as a displacement of competition. *See Medic Air Corp.*, 843 F.2d at 1189.

More importantly, we have before us numerous concrete legislative actions that indicate California, instead of making regulation the order of the day in the hospital service sector of the economy, has committed itself to a competitive market.[12] It thus appears that the state's policy is to enhance competition rather than to replace it. *See Town of Hallie*, 471 U.S. at 42 n. 5, 105 S.Ct. at 1718 n. 5 (considering state statutes in concluding that competition had been replaced by regulation); *Grason Electric Co.*, 770 F.2d at 838 (basing its conclusion that competition had been displaced in part on the defeat in the state legislature

of numerous attempts to deregulate). In short, the foreseeable result of the statutory scheme before us is that hospital districts such as Antelope will compete, not that they will preclude competition by others. *Cf. Columbia*, 111 S.Ct. at 1350 (foreseeable result of zoning authority that competition will be displaced).

This court has previously held that when the circumstances indicate that a state's general policy is to displace competition with regulation, a subordinate state entity need show no more than an authorization to "do business" to qualify for the state action exemption. *See Grason Electric Co.*, 770 F.2d at 836–38; note 4, *supra.* For in such a case "suppression of competition is the foreseeable result" of the statutory scheme. *Columbia*, 111 S.Ct. at 1350. We now hold that when there are abundant indications that a state's policy is to support competition, a subordinate state entity must do more than merely produce an authorization to "do business" to show that the state's policy is to displace competition.[13] The defendants did not act in ac-

---

• "enter into contracts with health care provider groups ... and independent physicians and surgeons for the provision of health services" (§ 32126.5(a)) (emphasis added);
• operate or provide assistance to "health care services provider groups and organizations ... necessary for the maintenance of good physical ...
• health in the communities served by the district (§ 32121(m));
• enter into joint ventures for the benefit of the district (§ 32121(o));
• "exercise the right of eminent domain for the purposes of acquiring real or personal property of every kind necessary to the exercise of any of the powers of the district" (§ 32121(d));
• borrow and incur indebtedness (§ 32130);
• issue bonds (§ 32316);
• contract with health care providers and physicians as long as this "does not result in any profits or gain to the district from the services so rendered" (§ 32129) (emphasis added);
• "do any and all other acts and things necessary to carry out this division" (§ 32121(k));
• exercise all powers "necessarily implied" (§ 32121(k)).

**12.** California has passed a number of amendments to the local hospital district law over the years, and these amendments contemplate that the districts operate in a competitive environ-

ment. These amendments 1) allow hospital districts to transfer assets to private nonprofit corporations (§ 32121(p) (West Supp.1989)) and 2) exempt from disclosure to the public "records of a local hospital district ... which relate to any contract with an insurer or nonprofit hospital service plan for inpatient or outpatient services or alternative rates" for one year after execution of the contract. Cal.Gov't Code § 6254(t) (West Supp.1987).

Moreover, California has affirmatively acted to deregulate hospital and other health care services. These provisions 1) permit public and private third party payors to contract for inpatient hospital services (Cal.Welf. & Inst.Code § 14081); 2) do away with older legislation requiring health care providers to obtain certificates of need to construct or add to health care facilities (Cal.Health & Safety Code § 439.7 (West Supp.1989)); and 3) permit "California purchasers, providers, and payers to form efficient-sized bargaining units for the purpose of contracting for the delivery of health care services." (Cal.Bus. & Prof.Code § 16770(b) (West Supp.1989)).

**13.** A third type of case may arise. A state's general policy may be to promote competition, but the state might nevertheless authorize a particular anticompetitive activity. We are not faced with such a case at present. Nevertheless, we speak of it to emphasize the narrowness of our holding. Since the question in all cases

cord with California policy when they engaged in anticompetitive conduct, and the state-action exemption is as a consequence unavailable to them. We therefore reverse the order of summary judgment in favor of defendants on Lancaster's antitrust claim.[14]

## IV

We next consider the district court's order of summary judgment in favor of defendants on Lancaster's RICO claim. We conclude that summary judgment was appropriately granted.

■ The RICO claims against Antelope and District fail because government entities are incapable of forming a malicious intent. *Biondolillo v. Sunrise*, 736 F.Supp. 258, 260–61 (S.D.Fla.1990); *North Star Contracting Corp. v. Long Island R.R. Co.*, 723 F.Supp. 902, 907–908 (E.D.N.Y.1989); *In re Citisource, Inc. Securities Litigation*, 694 F.Supp. 1069, 1080–81 (S.D.N.Y.1988); *Massey v. Oklahoma City*, 643 F.Supp. 81 (W.D.Okl.1986); *see also Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 261, 101 S.Ct. 2748, 2756, 69 L.Ed.2d 616 (1981) (noting the existence of "respectable authority" that municipal corporations "cannot, as such, do a criminal act or a willful and malicious wrong...."). A specific intent to deceive is an element of the predicate act, mail fraud, on which Lancaster's RICO claim is based. 18 U.S.C. § 1341, *Sun Sav. and Loan Assoc. v. Dierdorff*, 825 F.2d 187 (9th Cir.1987).

The wisdom of this rule is evident in light of the circumstances of the instant case. The "body politic," that is, the taxpayers, will pay if Lancaster's RICO claim is successful. Yet the "body politic" was the target of the deception perpetrated.

Thus, the "body politic" was not even aware of any dishonest activities, and plainly lacked the specific intent to deceive which is an element of mail fraud.

■ Moreover, Lancaster cannot impose liability on the "body politic" by appeals to the doctrine of *respondeat superior* or to principles of agency. For public policy is offended if all the citizens of a state are made liable for extraordinary damages as a result of the actions of a few dishonest officials. In *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 the Court held that punitive damages are not available in § 1983 actions, rejecting claims that the city should be responsible for the reprehensible conduct of its agents. The Court distinguished municipal corporations from the ordinary variety:

> [T]he relation which the officers of a municipal corporation sustain toward the citizens thereof for whom they act, is not in all respects identical with that existing between the stockholders of a private corporation and their agents; and there is not the same reason for holding municipal corporations, engaged in the performance of acts for the public benefit, liable for the willful or malicious acts of its officers, as there is in the case of private corporations."

*Fact Concerts*, 453 U.S. at 261–62, 101 S.Ct. at 2757 (*quoting Hunt v. City of Boonville*, 65 Mo. 620, 624, 625 (1877)). Exemplary damages are not available against municipal corporations, "because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer [i]s being chastised." 453 U.S. at 263, 101 S.Ct. at 2757. Since civil RICO

---

under *Town of Hallie* turns on the state's policy, it seems clear that a particular authorization to act in an anticompetitive manner makes the state action exemption applicable. Further, it should not ordinarily take a great many such specific authorizations to show that the state's policy is to displace competition with regulation.

**14.** We note that there is no support for defendants' assertion that Lancaster cannot be awarded attorney's fees if Lancaster's antitrust action for injunctive relief is successful. Defendants

cite in support of their position the Local Government Antitrust Act of 1984 ("LGAA"), 15 U.S.C. §§ 34–36. The LGAA precludes the recovery of damages, costs, or attorneys fees, on the basis of 15 U.S.C. §§ 15, 15a, or 15c, from local government entities. 15 U.S.C. § 35(a). However, the provision that mandates that costs and attorneys fees be awarded to plaintiffs who "substantially prevail" in actions for injunctive relief is 15 U.S.C. § 26. Section 35(a), by its clear terms, has no effect on § 26. *See also Palm Springs Medical Clinic, Inc. v. Desert Hospital*, 628 F.Supp. 454 (C.D.Cal.1986).

damages are not merely compensatory, but are trebled, 18 U.S.C. § 1964(c), *Newport* is compelling. As such, Lancaster cannot establish that Antelope or District committed mail fraud, and its RICO claim against them falls.

Lancaster's RICO claim against Group is more plausible, but we agree with the district court that Lancaster has not produced facts sufficient to support it. The problem is again Lancaster's inability to establish the predicate act of mail fraud.

Federal Rule of Civil Procedure 9(b) requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme. Fed.R.Civ.P. 9(b). The Ninth Circuit has repeatedly insisted that this rule be followed in RICO actions alleging the predicate act of mail fraud. *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir.1989) (failure to specify the time, place, and content of the alleged mail fraud); *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 196 (9th Cir.1987) (fraud pleaded with sufficient particularity when four instances in which the scheme was furthered by use of the mails are specifically alleged); *Schreiber Dist. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986).

█ Lancaster has failed to specify the facts relating to the alleged use of the mails. Lancaster does contend that the application that Group filed with the California Secretary of State in order to have its status changed from for-profit to not-for-profit was sent by mail on or about July 27, 1987. However, at least two predicate acts are required in order to establish a "pattern" for RICO purposes, 18 U.S.C. § 1961(5), and Lancaster has failed to show a second mailing. Although Lancaster claims that in July or August of 1987 Group delivered to District a letter in which Group fraudulently suggested that it would repay District for its assistance, this claim is demolished by an uncontroverted declaration that the letter was hand delivered, not sent through the mails.

Lancaster's other contentions regarding the use of the mails are too generalized to satisfy the dictates of Rule 9(b). For instance, Lancaster claims that District, as part of a scheme in which Group participated, used the mails to submit claims for reimbursement to state and federal health care financing agencies for services rendered to patients referred to Antelope pursuant to illegal kickback schemes. However, no specific mailings are mentioned; instead, the applicable time period "from 1986 up through the present" is listed. This is insufficient. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir.1989).

█ Of more concern than Lancaster's failure to adequately support the alleged use of the mails is Lancaster's failure to adequately support its allegations of fraud. Lancaster claims that defendants engaged in "misappropriation of public funds, violations of federal and state anti-kickback statutes, and violations of state law prohibiting the making of false entries in the records of a corporation." However, none of the actions allegedly taken by defendants constitute fraud.

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court ruled that the mail fraud statute only protects *property rights*, not the intangible right of the citizenry to good government.[15] The facts of *McNally* are similar to those of the instant case. A government official was said to have awarded a valuable contract to one insurance company on the condition that a second company in which he had an ownership interest receive a share of the commissions earned by the first. This "kickback scheme" did not fall within the mail fraud statute. 483 U.S. at 360–61, 107 S.Ct. at

---

15. *McNally* has now been superseded by statute. *See* 18 U.S.C.A. § 1346 (1990). However *McNally* continues to provide the rule of decision for conduct that occurred prior to the statute's enactment on November 18, 1988. See *United States v. Soriano,* 880 F.2d 192 (9th Cir.1989); *United States v. Kato,* 878 F.2d 267 (9th Cir. 1989). Congress, of course, cannot criminalize conduct that has already occurred, U.S. Const., Art. I § 9 cl. 3, and mail fraud is a criminal offense.

2882.[16] *See also United States v. Lew,* 875 F.2d 219 (9th Cir.1989) (property must be obtained from the person who is deceived); *First Pac. Bancorp, Inc. v. Bro,* 847 F.2d 542, 547 (9th Cir.1988) ("[U]se of the mail with false or fraudulent pretenses for the specific purpose of causing pecuniary loss must be alleged.") (citations omitted).

Lancaster simply cannot establish that defendants sought to deprive it of property. Consider Lancaster's claim that defendants violated federal and state anti-kick-back statutes. This claim is grounded on the allegation that assets were transferred to Group with the understanding that Group would refer all of its patients to Antelope. This alleged referral activity was not designed to deprive Lancaster of either tangible or intangible property. It was part of an attempt to increase Antelope's market share at the expense of its competitor's. Similarly, allegations that false entries were made in corporate records also cannot establish mail fraud under *McNally.* Again, these false entries were not part of an attempt to deprive another of property, but were part of an attempt to increase Antelope's market share. The same is true for all of Lancaster's claims.

"Market share" is neither tangible or intangible property; its loss is far too amorphous a blow to support a claim of mail fraud under the reasoning of *McNally,* 483 U.S. at 356–60, 107 S.Ct. at 2879–82, and *Carpenter,* 484 U.S. at 26, 108 S.Ct. at 321 (newsmatter a commodity traded like any other). Put differently, it might be said that defendants hoped to "steal" Lancaster's customers. But it cannot be said that these customers were Lancaster's property.

The "fraud" Lancaster alleges is in reality nothing more or less than unalloyed anticompetitive conduct. This conduct may be unacceptable, but it is not "fraud." We

accordingly affirm the order of summary judgment in favor of defendants on Lancaster's RICO claim.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

16. Subsequently, in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) the Supreme Court held that § 1341 encompasses intangible property rights. *Carpenter* involved the Wall Street Journal's right to the exclusive pre-publication use of its "heard on the street" columns. The Court noted that newsmatter " 'is stock in trade ... to be distributed and sold to those who will pay money for it, as for any other merchandise.' " 484 U.S. at 26, 108 S.Ct. at 321 (quoting *International News Service v. Associated Press,* 248 U.S. 215, 236, 39 S.Ct. 68, 71, 63 L.Ed. 211 (1918)).