ED to the district court for a new trial consistent with this opinion.

## In re BRAND NAME PRESCRIPTION DRUGS ANTITRUST LITIGATION.

### No. 99–1167.

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1999.

Decided July 13, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 9, 1999.*

\* Hon. Joel M. Flaum and Hon. Diane P. Wood did not participate in the consideration of the    petitions.

George L. Saunders, Jr. (argued), Saunders & Monroe, Chicago, IL, for Plaintiffs–Appellants.

J. Thomas Rosch (argued), Latham & Watkins, San Francisco, CA, for Bindley Western Industries, Inc., Cardinal Health, Inc., Bergen Brunswig Corp., Wholesalers.

William F. Cavanaugh, Jr. (argued), Patterson, Belknap, Webb & Tyler, New York, NY, for Manufacturers, Abbott Laboratories, Forest Laboratories, Inc.

Before POSNER, Chief Judge, and BAUER and EASTERBROOK, Circuit Judges.

POSNER, Chief Judge.

Retail pharmacies brought suit under section 1 of the Sherman Act, 15 U.S.C. § 1, against manufacturers and wholesalers of brand-name prescription drugs, charging that the defendants had conspired to deny discounts to the pharmacies. An additional claim emerged during the course of the litigation—that the defendants had conspired to peg price increases to changes in the Consumer Price Index. After an earlier decision by this court resolved some of the issues, see 123 F.3d 599 (7th Cir.1997), the plaintiffs settled with a number of the defendants and went to trial before a jury against the rest. At the conclusion of the plaintiffs' case in chief on liability, which took eight weeks to present, the district judge granted judgment as a matter of law for the defendants. The appeal challenges both the judge's "bottom line" and a number of his subsidiary rulings.

The evidence shows that the manufacturers of brand name (as distinct from generic) prescription drugs engage in price discrimination in the economic sense, selling the identical product to different customers at different prices even though the manufacturers' cost of selling to them is the same. The favored customers are primarily hospitals, health maintenance organizations, and nursing homes; the disfavored are pharmacies. Price discrimination implies market power, that is, the power to charge a price above cost (including in "cost" a profit equal to the cost of equity capital) without losing so much business so fast to competitors that the price is unsustainable. The reason price discrimination implies market power is that assuming the lower of the discriminatory prices covers cost, the higher must exceed cost. There is no general rule against the possession of market power or the use of price discrimination to exploit it, but the plaintiffs argue that the source of the drug manufacturers' market power manifested in their discriminatory pricing is collusion, and if this is right they have a case under section 1.

Manufacturers of brand name prescription drugs generally do not sell directly to the retailers of their drugs, that is, to hospitals, HMO's, nursing homes, and pharmacies, but instead sell to wholesalers for resale to the retailers. A wholesaler is compensated for the warehousing and other functions that he performs in the distribution of his drugs through the difference between the price that he pays his supplier and the price at which he resells to retailers. The danger to a price-discriminating drug manufacturer is that a wholesaler might buy at the discounted price more than he needed to supply his hospital, HMO, and nursing home customers and sell the surplus to pharmacies at a price below the nondiscounted price that the manufacturer wanted them to pay. The industry calls this "diversion" (economists call it "arbitrage") and of course dislikes it. Suppose the manufacturer's profit-maximizing price to an HMO for some drug were

$40, his price to a pharmacy for the same drug $65, and the wholesaler tacked on $10 to compensate him for his services in distribution. Suppose that the HMO wanted 10 units of the drug and the pharmacy 2 units. If the wholesaler sold 10 units to the HMO at $50 and 2 units to the pharmacy at $75, as the manufacturer intended, the latter's total revenue would be $530 and the wholesaler's $120 (12 × $10). If instead the wholesaler told the manufacturer that he needed 12 units for the HMO and none for the pharmacy, and the manufacturer therefore sold him 12 units at $40, two of which the wholesaler resold to the pharmacy at some price between $50 and $75 (say, $60), then although the wholesaler's revenue would increase to $140 ($120 plus the added profit from selling 2 units to the pharmacy for $20 above cost rather than $10) and the pharmacy would save $30, the manufacturer would be worse off; his revenue would decline to $480.

Manufacturers could prevent this evasion of their discriminatory pricing scheme by selling directly to the retailers, thus bypassing the wholesalers. The plaintiffs argue that fear that this would happen led the wholesalers to adopt a chargeback system—the focus of this litigation—under which the manufacturer sets a uniform price to the retailers, contracts directly with the favored retailers for discount prices to them, and reimburses the wholesaler for the difference between that and the full, uniform price. In the previous example, the price to the wholesaler would be a flat $65 regardless of whom he was reselling to. But upon proof by him that he had resold to an HMO at, say, $60 ($50, the price agreed upon between the manufacturer and the HMO, plus the wholesaler's service fee, negotiated with the retailer, for performing the wholesale function, and assumed in this example consistent with the previous one to be $10), the manufacturer would reimburse him $15. And so he would net the $10 service fee to compensate him for performing the wholesaling function. The chargeback system eliminates diversion (arbitrage) by requir-

ing the wholesaler, in order to avoid a loss when he resells at a discounted price, to report to the manufacturer his sales to that customer, so that the manufacturer can determine whether the customer is indeed one entitled to a discount. With the chargeback system in place, the manufacturers were content to sell through the wholesalers rather than directly to the retailers. The latter prefer, other things being equal, to deal with a single supplier who stocks the drugs of the different manufacturers (namely a wholesaler) than with each manufacturer separately. And if the manufacturers took over the wholesaling function, they would have to charge a higher price to the retailers to recover the cost of performing that function.

█ The plaintiffs presented evidence that the wholesalers adopted the chargeback system collectively rather than individually. Even so, the system would be a per se violation of the Sherman Act—and only per se violations are charged in this case—only if it were either a device for eliminating competition among wholesalers, which is not charged, or an instrument of a conspiracy among the manufacturers to eliminate or reduce competition among themselves. If, instead, each manufacturer was engaged in lawful, noncollusive price discrimination, it would no more be illegal per se for the wholesalers to devise collectively a system by which each manufacturer could engage in discriminatory pricing while selling through wholesalers than it would be illegal per se for them to agree on a standard form for inventorying drugs or a common method of inspecting drugs to make sure they are safe. Competitors are permitted by the antitrust laws (and certainly by the per se rule) to engage in cooperative behavior, under trade association auspices or otherwise, provided they don't reduce competition among themselves, e.g., *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100–04, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441

U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188–89 (7th Cir.1985), or help their suppliers or customers to reduce competition. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 727–30, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 179 F.3d 1073 (7th Cir.1999); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1438 (7th Cir.1986); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 462 (3d Cir.1998). If the wholesalers in this case were merely helping individual manufacturers maximize their profits by methods permitted by antitrust law, which include noncollusive price discrimination, there was no violation of antitrust law at either the manufacturer or the wholesaler level.

The plaintiffs had therefore to prove that the defendant manufacturers agreed to deny discounts to them. When last this case was before us, the district judge had denied summary judgment for the manufacturers and so we were required to assume for purposes of the appeal that the manufacturers had indeed colluded. On remand the assumption fell away and the plaintiffs had to *prove* that the manufacturers had colluded. There were two ways in which they might have been able to do this: by presenting direct evidence (admissions or eyewitness accounts) that the manufacturers had agreed to collude; or by presenting circumstantial evidence, economic in character, that their behavior could better be explained on the hypothesis of collusion than on the hypothesis that each was embarked on an individual rather than a concerted course of action—that each, in other words, was merely exploiting the market power it had, rather than seeking to create or amplify such power through an agreement with competitors not to compete. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, *supra*, at 1076–77; *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir.1995); *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 48–49 (7th Cir.1992); *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171–73 (7th Cir.1990); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 176 F.3d 1055, 1060–62 (8th Cir.1999); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993).

The direct evidence that the plaintiffs emphasize is testimony about a meeting of wholesalers at which representatives of some drug manufacturers, though none who remain in the case after several settled, were present. The subject was the formation of buying groups by pharmacies that hoped they could obtain discounts by forming leagues which would bargain collectively with manufacturers and wholesalers. The participants in the meeting expressed hostility toward such endeavors and indicated a disinclination to grant these groups any discounts. None of the manufacturer defendants was present, as we have said, and there is no evidence that the manufacturers who were represented at the meeting were acting as agents of the defendants. While the testimony might be evidence that the wholesalers agreed not to discount their own service fees to the buying groups, such an agreement is not among the unlawful acts charged. The complaint is not that the wholesalers were trying to eliminate competition among themselves, by fixing prices or credit terms or other competitive dimensions of the wholesale market, as in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (per curiam), but that they were agents of a manufacturers' conspiracy. The joint adoption of a business method or standard, that is, the chargeback system, independent of any design to reduce competition at either the manufacturer or the

wholesaler level, would not raise questions under the per se rule.

The only other direct evidence of a manufacturers' conspiracy that merits consideration is a scattering of internal company documents indicating anxiety that competitors might decide to grant such discounts. All firms worry about price cutting by their competitors; these worries are not evidence of price fixing. *Monsanto Co. v. Spray–Rite Service Corp., supra,* 465 U.S. at 763, 104 S.Ct. 1464. Here they were, if anything, evidence of the contrary, since there is no indication that anyone employed by a manufacturer thought that such price cutting to pharmacies as occurred was in violation of an agreement among the manufacturers. Most of the anxiety about price, moreover, was expressed not by the manufacturers but by the wholesalers. Remember that there are two kinds of price involved in the distribution of brand name prescription drugs—the prices negotiated between the manufacturers and the retailers, and the wholesalers' service fees. The wholesalers feared the shaving of their service fees by aggressively bargaining buyer groups. That fear has nothing to do with the issues in this case.

■ The plaintiffs' principal economic evidence was that brand name prescription drugs are indeed priced discriminatorily, to the detriment of the pharmacies; that discrimination requires (and thus demonstrates the existence of) market power; and that the chargeback system facilitates discrimination. The defendants spent days cross-examining the plaintiffs' principal economic witness, Professor Robert Lucas, and ultimately persuaded the district judge to exclude most of his testimony under the rule of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). But what was objectionable about his evidence actually had nothing to do with *Daubert;* it was that the evidence mainly concerned a matter not in issue—that the manufacturers of brand name prescription drugs engage in price discrimination, showing that they have market power. Everyone knows this. The question is whether that market power owes anything to collusion. (Even if it did, we remind that to obtain damages the plaintiffs would have to separate the price effects of collusion from the price effects of the defendants' lawful market power. *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 152 F.3d 588, 593–94 (7th Cir.1998).) On that, Lucas had virtually nothing to say. It is irrelevant, therefore, that, as the plaintiffs point out, the district judge erred in excluding Lucas's testimony on the grounds that he did— that Lucas had not studied the prescription drug industry in depth and had formulated his tentative opinion after working on the case for only 40 hours. His opinion that there is price discrimination in the prescription drug industry is one that an economist of Lucas's distinction should have been able to reach in even less time. Indeed the existence of price discrimination should have been removed as an issue at trial by a stipulation of the parties.

■ The judge also excluded the evidence of another of the plaintiffs' economic experts, Professor Jeffrey Perloff, on an erroneous ground. Perloff's evidence was that the chargeback system is designed to prevent arbitrage. True—and it should have been stipulated as true—but irrelevant for the reasons explained earlier. The judge thought Perloff had given insufficient weight to the fact that federal law limits the resale of prescription drugs by some of the favored retailers; but we had discussed that law in our previous opinion and explained that it could not be relied upon to prevent arbitrage. 123 F.3d at 603. The important point is that since the unilateral exercise of a firm's individual market power does not violate the antitrust laws, preventing the frustration of that exercise through arbitrage is not a violation either.

Paradoxical as it may seem, market power is found in many highly competitive

markets, for example the markets for scholarly books and journals. (The phenomenon is sometimes referred to as "monopolistic competition.") Publishers of scholarly books commonly publish the same book in hardcover and paperback versions at prices that differ by far more than the difference in costs, and publishers of scholarly journals commonly charge a much higher price to libraries than to individuals even though the cost of making and selling the journal is identical to both classes of purchaser. These price differences are possible because the book, or journal, lacks perfect substitutes (copyright law prevents the sale of identical substitutes without the copyright holder's consent). Brand name prescription drugs ordinarily are patented, and, though the patent may have expired, the physicians who prescribe the drug may continue to prescribe the branded version rather than the generic substitute, whether out of inertia, or because they think the branded version may be produced under better quality control (the rationale for trademarks), or because the patient may feel greater confidence in a familiar brand. The same thing is true if the original brand, whether or not still protected by a patent, now has a therapeutically close substitute sold under a brand name that is less familiar to physicians or patients than the original brand.

It would not be surprising, therefore, if *every* manufacturer of brand name prescription drugs had some market power. If so, every manufacturer would charge different prices depend on the elasticity of demand of different classes of purchaser with respect to price (that is, the responsiveness of quantity demanded to a change in price). The least elastic demanders are the pharmacies, because they must stock a full range of drugs in order to be able to fill prescriptions. They can therefore be expected to be charged the highest prices. In contrast, a hospital, nursing home, or HMO or other managed-care enterprise has a more elastic demand because it can influence (for example through a "formulary," a list of approved or recommended drugs) the physician's choice of which brand (or no brand—a generic) to prescribe. A slight increase in the price of one brand to such a purchaser might cause the manufacturer's sales of that brand to plummet. That manufacturers of brand name prescription drugs grant discounts to the enterprises we have listed but refuse to grant discounts to pharmacies is thus consistent with unilateral profit-maximizing behavior by the manufacturers.

■ The alternative hypothesis is that the manufacturers refuse to grant discounts to pharmacies because they have agreed among themselves not to. As there is neither an a priori reason nor direct evidence to suppose this hypothesis more likely than the first, and as the plaintiffs bore the burden of persuasion, it was necessary for them to present economic evidence that would show that the hypothesis of collusive action was more plausible than that of individual action. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 571–72 (11th Cir.1998). They did not, however, as the defendant manufacturers rather absurdly argue, have to exclude all possibility that the manufacturers' price discrimination was unilateral rather than collusive. That would imply that the plaintiff in an antitrust case must prove a violation of the antitrust laws not by a preponderance of the evidence, not even by proof beyond a reasonable doubt (as indeed is required in criminal antitrust cases), but to a 100 percent certainty, since any lesser degree of certitude would leave a possibility that the defendant was innocent.

■ The plaintiffs are equally wide of the mark, however, when they argue that proof of price discrimination shifts to the defendants the burden of proving that the discrimination was unilateral rather than collusive. Because price discrimination is as consistent with individual as with collusive behavior, mere proof that discrimination exists does not support, even weakly,

an inference of collusion. The plaintiffs have the burden of rebutting, by the normal civil standard of a preponderance of the evidence, the hypothesis of individual maximizing action. They failed to come up with any evidence. Lucas did testify that he thought the demand by pharmacies no less elastic than that by hospitals, HMO's, and nursing homes, and if so—if the manufacturers of brand name prescription drugs have no significant market power individually, since they appear to have no significant market power with respect to those other customers—this would suggest that higher prices to pharmacies are the product of collusion. But this part of Lucas's testimony was properly excluded, or alternatively entitled to no weight, because it rested on a demonstrated lack of knowledge about the competitive significance of formularies—the lists of approved or recommended drugs that hospitals, nursing homes, and HMO's and other managed-care enterprises issue. He said that a pharmacy could issue a formulary. It could, but no one would pay any attention to it, because a pharmacy, unlike a hospital, nursing home, or other provider of medical care, has no clout with doctors, the ones who actually order prescription drugs. There is no evidence that pharmacies issue formularies.

The record does contain a study by a consulting firm which found that many branded drugs have close therapeutic substitutes; this of course is true, but most books also have close substitutes, yet individual books are sufficiently distinctive to enable the publisher to price his books on a discriminatory basis even though he is not colluding with any other publisher. A consumer may rationally pay more for a trademarked product than for its physically identical substitute merely for the greater assurance of quality that a trademark conveys. 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:5, p. 2–8 (4th ed.1996); *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 98 (2d Cir.1985); *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 303 (9th Cir.1979).

And all that really matters is that physicians, for whatever reason, in writing prescriptions tend to write a brand name rather than the generic (chemical) name. It is this practice that forces pharmacies to carry a full line of brands and thus prevents them from credibly threatening a manufacturer with refusing to stock his brand unless he offers a discount.

■ Since the market power conferred by a patent or trademark would vary across brands, evidence of uniform discounts (for example, that all HMO's received a 20 percent discount from the full price on all brands) might be indicative of a conspiracy. The plaintiffs contended in rebuttal at the oral argument of the appeal that this was the case here, but their brief does not make the argument or point to evidence in the record that might support it, so it is forfeited.

■ All this leaves of the plaintiffs' case is their claim that in the early 1990s the defendant manufacturers agreed among themselves to peg future price increases to the Consumer Price Index. There is enough evidence of such an agreement to create a triable fact. For example, an internal memorandum of defendant Burroughs Wellcome, dated September 1993 and entitled "Price Escalation Proposal," states that "the industry has generally agreed to informally keep its prices in line with CPI or CPI plus 1 to 2 %." The document is subject to interpretation (as is the other evidence, unnecessary to describe, that also supports the claim), but the interpretation of ambiguous documentary evidence of collusion is for the jury. *Monsanto Co. v. Spray–Rite Service Corp.*, *supra*, 465 U.S. at 765–66 and n. 11, 104 S.Ct. 1464; *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 614 (7th Cir.1997); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, *supra*, 176 F.3d 1055, 1061–62. The district judge threw out the CPI claim not because it was unfounded but because he thought it barred by the *Noerr–Pennington* doctrine, which exempts from antitrust law collusive efforts to obtain governmen-

tal protection against the winds of competition. E.g., *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 371 (7th Cir.1987); *Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 471 (7th Cir.1982). During the period of the alleged CPI conspiracy, the prescription drug industry was under political pressure to limit price increases. Had the industry wanted to obtain a law that would limit annual increases to the rate of inflation as measured by the CPI, plus modest additions, they could without antitrust liability have negotiated the proposal among themselves even though this would have involved their agreeing on how much to seek from government in the way of permitted price increases.

■ But they didn't want a law; they wanted (they say) to ward off a price-control law by being good boys and keeping their price increases moderate. The distinction is not critical; opposing legislation is a way of participating in the legislative process just as proposing legislation is. It would not make sense to interpret *Noerr–Pennington* in such a way as to encourage industries to channel all their legislative activity into proposing laws (here perhaps a law against passing a price-control law!). But the doctrine does not authorize anticompetitive *action* in advance of government's adopting the industry's anticompetitive proposal. The doctrine applies when such action is the consequence of legislation or other governmental action, not when it is the means for obtaining such action (or in this case inaction). *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 425, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988); *Sandy River Nursing Care v. Aetna Casualty*, 985 F.2d 1138, 1142–43 (1st Cir.

1993). Otherwise every cartel could immunize itself from antitrust liability by the simple expedient of seeking governmental sanction for the cartel after it was up and going.

■ The district judge thus erred in throwing out the CPI claim on *Noerr–Pennington* grounds, and he also erred in treating the doctrine as a rule of evidence that forbids the introduction of evidence (specifically, testimony by a corporate executive named David Landsidle) relating to efforts to obtain governmental protection to show that the industry has indeed jumped the gun and begun to cartelize before getting governmental sanction for cartelization. *United Mine Workers v. Pennington, supra*, 381 U.S. at 670 and n. 3; *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1160 (7th Cir.1983). Such evidence can be excluded under Fed.R.Evid. R. 403 if confusing or unduly prejudicial, *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 466–67 (7th Cir. 1981), but there is no blanket rule of inadmissibility.

There is, however, a potential issue of waiver that beclouds the charge of a CPI conspiracy. In one of their briefs the last time this case was here, the plaintiffs told us that none of them intended to assert a claim for damages based on such a charge, that the evidence of the conspiracy would be used only to establish the existence of a "culture of collusion" in the industry. To establish damages the plaintiffs would have to prove that the price of brand name prescription drugs would have been lower (and by how much) had the defendants not agreed to peg price increases to the CPI. Since the defendants may have been seeking to moderate their price increases in order to ward off price controls, the price-fixing conspiracy (if there was one) may have resulted in lower rather than higher prices, in which event the defendants' customers were not harmed and cannot obtain damages. *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1256–57 (7th Cir.1995).

What is more, in our previous opinion we held that the indirect-purchaser doctrine, which limits the right to bring antitrust overcharge suits to buyers who buy directly from the overcharging sellers rather than indirectly through middlemen, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), would bar the plaintiffs from recovering damages unless the wholesalers were members of the manufacturers' conspiracy. 123 F.3d at 604–07. The plaintiffs point to no evidence that any of the defendant wholesalers were members of a CPI conspiracy, so it's difficult to see how the plaintiffs could recover any damages even if they could prove that they paid higher prices as a result of such a conspiracy. They did present evidence (albeit insufficient, as we have seen) that the wholesalers were part of a manufacturers' conspiracy to charge discriminatory prices, but that is separate from the alleged CPI conspiracy and anyway the wholesalers are now out of the case.

■ In the present appeal, however, the plaintiffs argue that the conspiracy did result in higher prices, and the defendants do not let out a peep about the indirect purchaser doctrine. And while reminding us that the plaintiffs had previously foresworn a claim of damages based on that alleged conspiracy they do not argue that the claim is waived, barred by the doctrine of judicial estoppel or by the law of the case doctrine, or otherwise unavailable. They thus have waived waiver. E.g., *United States v. Woods*, 148 F.3d 843, 849 n. 1 (7th Cir.1998); *Riemer v. Illinois Dept. of Transportation*, 148 F.3d 800, 804 n. 4 (7th Cir.1998); *United States v. Layeni*, 90 F.3d 514, 522 (D.C.Cir.1996). (This is an almost incomprehensible lapse, since several of the district judge's evidentiary rulings, which he'll now have to revisit, indicate that *he* assumed that there was no CPI price-fixing charge.) They put all their eggs in the *Noerr–Pennington* basket—mistakenly, because as we have seen there is no tenable defense based on the doctrine of those cases.

The judgment is therefore vacated so far as the CPI charges are concerned, and otherwise affirmed (which means that the wholesalers are dismissed from the case), and the case is remanded for further proceedings in conformity with this opinion. We suggest that before proceeding to trial on the CPI issue, the district judge require the plaintiffs to show that they have (in light of the doubts we've expressed) a viable theory of damages; if they do not, there would be no point in a trial on liability, as they do not appear to be seeking injunctive relief against the alleged CPI conspiracy. But these details remain to be sorted out on remand.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.